# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James Scott,                                        Civil No. 04-4758 (DWF/RLE)

                    Plaintiff,

v.                                                          **MEMORANDUM
                                                    OPINION AND ORDER**

Canadian National Railway
Company (CN) and Duluth,
Missabe and Iron Range Company
(DMIR), a corporation,

                    Defendants.

_____

Jordan S. Kushner, Esq., Law Office of Jordan S. Kushner, counsel for Plaintiff.

Andrew J. Voss, Esq., and Gregory J. Wiley, Esq., Littler Mendelson, PC, counsel for Defendants.

_____

## Introduction

The above-entitled matter came before the undersigned United States District Court Judge on

December 23, 2005, pursuant to a Motion for Summary Judgment brought by Canadian National

Railway Company ("CN") and Duluth, Missabe and Iron Range Company ("DMIR"), a corporation

(collectively, "Defendants").  Plaintiff James Scott brought a Motion to Strike Defendants' Supplemental

Reply Affidavit, or, in the Alternative, to Strike Exhibit E of the Defendants' Reply Affidavit.  For the

reasons set forth below, Defendant's motion is granted; Plaintiff's motion is denied.[1]

_____

1       The Court rejects Scott's assertion that Defendants' Supplemental Affidavit of Gregory J. Wiley should be stricken from the record on the ground that Defendants should have attached the affidavit's contents to the Defendants' affidavit in support of their principal motion.  First, the Court notes that Defendants did not submit David Moore's Affidavit in Wiley's Supplemental Affidavit—Defendants

                                                    (Footnote Continued on Next Page)

**Background**

Plaintiff James Scott worked for DMIR for over 30 years.  DMIR operates a railroad in northeastern Minnesota.  Scott, who is African-American, was initially hired as a track laborer, but spent most of his career working in the engineering department as a locomotive crane operator.  During his employment with DMIR, Scott was a member of the Brotherhood of Maintenance of Way Employees labor union ("BMWE").  The BMWE maintains a collective bargaining agreement with DMIR.  Scott understood that if he had a complaint about unjust treatment, he was entitled to use union grievance procedures, including a hearing, to determine whether he was treated fairly.  Scott was also aware that he could challenge a hearing decision and ultimately appeal to the National Railroad Adjustment Board.

On February 24, 2004, Scott was involved in a physical altercation with his supervisor and foreman, Jeffrey Engelmeier.  On that date, Scott confronted Engelmeier about Engelmeier's alleged failure to pay Scott for a meal period.  Scott said:

---

(Footnote Continued From Previous Page)
submitted Moore's Affidavit in Defendants' initial motion papers.  Second, Defendants submitted Mitch Ojard's e-mail statement as part of Exhibit B to Moore's Affidavit—which, as previously stated, Defendants submitted with their initial motion papers.  Finally, the full transcripts of Georgann Hatfield and Jeffrey Engelmeier are admissible because Defendants could not have reasonably anticipated that Scott would address issues regarding Hatfield and Engelmeier in Scott's responsive memorandum. Furthermore, Hatfield's entire deposition transcript is admissible on the basis that Scott relied on portions of Hatfield's deposition in Scott's responsive memorandum and the Court reserves the right to request a witness's entire deposition transcript.  Accordingly, the Court denies Scott's motion.

> So Mr. Rich Herring [the Roadmaster] walk out and Jeff Engelmeier kept on talking to me saying, Well I just don't know why you get paid this 40 minutes.  I said, . . . stop being an F and just pay the doggone meal period.  He jumps up, You call me – you refer to me as Mr. Engelmeier, blah, blah, blah.  I said, Sir, I have kids old as you are, kid.

(Affidavit of Gregory J. Wiley in Support of Defendants' Motion for Summary Judgment ("Wiley Aff."), ¶ 2, Deposition of James Scott ("Scott Dep.") at 114 (mistakes in original).)  Scott admits that he called Engelmeier a "fuck face."  Scott alleges that Engelmeier then pushed him onto a chair, the chair flipped over, and Scott fell onto the floor.  Scott admits that he got up and began hitting Engelmeier in the head with his fist.  Co-workers then separated Scott and Engelmeier.

The DMIR's Chief Engineer, David Moore, was responsible for supervising and disciplining employees in the engineering department, including Scott and Engelmeier. Moore directed Roadmaster Rich Herring to investigate the altercation between Scott and Engelmeier. Several DMIR employees witnessed the altercation.  After Herring completed the investigation, Moore recommended to DMIR Labor Relations that Scott receive a 60-calendar day suspension and that Engelmeier receive a 5-calendar day suspension.  Moore asserts that he based his recommendation on the reported facts of the altercation and each involved employee's disciplinary history at DMIR.

Moore determined that Scott had provoked the fight by calling his foreman names and that Scott's actions were insubordinate.  Moore also noted that Scott's personnel record reflected more than 13 prior disciplinary incidents, including unauthorized absences and failure to perform his job safely.  Scott's personnel record reflected that he was terminated and reinstated once and also received

numerous suspensions for his conduct.[2]  Moore stated that Scott committed more disciplinary

infractions than any other engineering department employee that DMIR employed during Moore's

tenure as Chief Engineer.   Moore held this position from 1997 to 2004.

Moore determined that Engelmeier had one prior disciplinary incident related to property

damage.  DMIR filed a charge of conduct unbecoming an employee against Scott for his violation of

Rules 1.6 and 1.7 of the Maintenance of Way Operating Rules.[3]  DMIR filed a charge against

Engelmeier for his violation of Rule 1.7.  After consulting with the Union General Chairman, Mike

Nagle, both Scott and Engelmeier waived their right to a formal hearing of the incident, admitted to

violating work rules, and accepted the discipline recommended by DMIR.  In March 2004, Scott

received the recommended 60-calendar day suspension from service without pay (a total of 42 working

days).  Engelmeier received the recommended 5-calendar day suspension from service without pay (a

total of 3 working days).

Following his suspension, Scott returned to work and had no further incidences with

---

2       Scott waived his right to a hearing in many of these instances, contested discipline on other
occasions, and, on one occasion, appealed the imposed discipline to the National Labor Relations
Board, which upheld the arbitrator's decision approving of DMIR's disciplinary action. Scott claimed
that some of these actions were imposed on a discriminatory basis.  Scott filed charges of discrimination
with the Minnesota Department of Human Rights in 1980 and 1991 and filed a claim for unjust
treatment with the BMWE in 1988.  DMIR was never found liable for race discrimination.

3       Rule 1.6 states that that "[e]mployees will not be retained in the service that are careless of the
safety of themselves or others, disloyal, insubordinate, dishonest, immoral, discourteous, quarrelsome or
otherwise vicious . . . ."  (Affidavit of David Moore in Support of Defendants' Motion for Summary
Judgment ("Moore Aff."), ¶ 4, Ex. A at 4.)  Rule 1.7 states that "[e]mployees must not enter into
altercations with each other, play practical jokes, or wrestle while on duty or on railroad property."
(*Id.*)

Engelmeier.  Scott admits that he no longer worked with Engelmeier after the suspension.  Scott never

made a formal complaint to DMIR that his suspension was discriminatory or that he was subjected to a

hostile work environment when he returned to work.  Nevertheless, Scott retired in July 2004,

explaining:

> It just made me feel me versus Engelmeier and I thought it was very unfair.  Which I can
> do all the training crane operators and stuff, but they treat him a little better than they
> treat me.  And I train all the crane operators so I figure no, so I decide I'm going to
> retire.  I know for a fact, Engelmeier, knowing him, he's eventually going to do it again
> to me, because he know for a fact he has a mark on his record because of me and I
> figure the best thing would be to retire.

(Scott Dep. at 154 (mistakes in original).)

On May 13, 2004, Scott filed a charge with the EEOC claiming disparate treatment due to his

March 2004 suspension.  The EEOC issued a No Probable Cause finding on July 20, 2004.  On

October 14, 2004, Scott filed this lawsuit asserting four claims.  Claims one through three assert race

discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 ("Section

1981"), and the Minnesota Human Rights Act (MHRA); claim four alleges assault.

Scott asserts that DMIR racially discriminated against him by imposing a 60-day suspension

when Engelmeier, a white employee, received a 5-day suspension for the altercation.[4]  Scott relies on the

---

4       Scott has abandoned a previous allegation of race discrimination concerning the suspension.  In
his Complaint (the "Complaint"), Scott asserted that DMIR officials "stated they could not have a black
man (or used worse names) hitting an official of the RR" in response to the altercation.  (Complaint at ¶
6.)  Scott further expounded on this allegation in his deposition, stating that Nagle overheard Moore say
"We can't have no nigger hitting no white man."  (Scott Dep. at 196.)  Moore and Nagle deny that
Moore ever made the statement, or any similar racially-biased statement.  In his Opposition
(Footnote Continued on Next Page)

affidavit statements of one former DMIR employee and one current DMIR employee to support his claim. First, Scott relies on Georgann Hatfield, a former engineering department clerk, who alleges that during the late spring or early summer of 2000, Moore referred to Scott using a racial epithet. Hatfield asserts that Scott called the engineering department headquarters to speak with Moore concerning a job assignment. Hatfield took Scott's messages and later reported Scott's numerous calls to Moore. Hatfield states that Moore said, "Oh, those niggers are all alike; you know the kind." (Declaration of Peter J. Nickitas in Support of Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Nickitas Dec."), Deposition of Georgann Hatfield ("Hatfield Dep.") at 29–30.)

Second, Scott relies on the testimony of Mitch Ojard, a DMIR employee who witnessed the altercation. Ojard alleges that shortly after January, 2005, Engelmeier stated, "I have always been waiting for a chance to get at [Scott]." (Nickitas Dec., Affidavit of Mitch Ojard ("Ojard Aff.") at ¶ 36.) Ojard also alleges that Engelmeier frequently used the word "nigger" to refer to Scott. (*Id.* at ¶ 38.) Ojard states that Engelmeier had a reputation "as a man with a temper," and that DMIR failed to punish Engelmeier for altercations he was allegedly involved in with other DMIR employees. (*Id.* at 48–50.) Ojard claims that in June 2005, Engelmeier told Ojard that he had to give a deposition regarding this lawsuit and that he "was going to say, 'Jim threw one punch, knocked me out, and that's how it ended.'" (*Id.* at ¶ 46.) Ojard refutes Engelmeier's characterization of the altercation. (*Id.* at ¶ 47.)

Scott also claims that during the course of his employment with DMIR, other white employees

---

(Footnote Continued From Previous Page)
Memorandum, Scott indicates that he is not relying on this evidence. (*See* Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pl's Opp. Mem.") at 25.)

were not disciplined as severely as he was based on similar rule infractions.  Scott claims that in the

1980s, Steve Koski received a one-week suspension for derailing a machine.  Scott claims that he

derailed a machine about three months after Koski and received a two-week suspension.  Scott also

claims that in the early 1990s, Greg Walgreen received no punishment for hitting a telephone line,

whereas Scott received "time off" for hitting a telephone line.  Scott also claims that about four years

ago, Paul Bergmann was never investigated for bending a crane boom.  Scott admits that he has no

knowledge about Koski's or Walgreen's disciplinary records prior to the alleged incidents.

Scott further testified that during his 30 years as a DMIR employee, he saw at least 200

"pushing and shoving incidents," and is unaware of anyone involved in such an incident receiving a 60-

day suspension.  (Scott Dep. at 201–202.)  Scott also alleges that Engelmeier was involved in

altercations with DMIR employees Tom Ledeen, Denny Young, and Hank Harper, for which DMIR

did not punish Engelmeier.  Scott stated that the incidences with Young and Harper occurred about four

years ago.  Scott also alleges that Engelmeier once "cursed Rich [Herring] out" and received no

punishment.

Scott further claims that DMIR discriminated against him based on race when making hiring and

firing decisions.  Scott also alleges that during the 1970s and 1980s, he "was always the first man laid

off . . . I was the cut-off point."  (Scott Dep. at 168.)  Scott admits, however, that lay-offs were based

on seniority, and that DMIR did not retain anyone with less seniority as part of the lay-off policy.  Scott

also asserts that he was the only African-American DMIR employee for over 15 years.  Scott asserts

that a past track supervisor, Dale Reno, told Scott that DMIR "wasn't going to have a black foreman

there."  (Scott Dep. at 193.)  Scott never bid for a foreman position.

7

Scott also contends that he was subject to a racially hostile work environment.  Scott bases his harassment claim upon several incidents, including two racial remarks that he heard at work and two words that he saw written on company property.  First, Scott claims that Denny Gould, supervisor at the Duluth docks, used the "n" word at him about five or six years ago.  Scott told his boss what had happened and Scott's boss told Ted Paschke, Superintendent of the railroad, about the incident.  Paschke questioned Gould about the incident, though it is unclear from the record whether any discipline was imposed.  Scott did not have any further incidents with Gould.

Second, Scott alleges that two years ago he saw the word "nigger" written on the inside of an engine at the DMIR's Minntac location.  Scott reported the graffiti to Steve Novak, a supervisor, who immediately had the word removed.  Scott never saw the graffiti again.  Third, Scott claims that three years ago he saw a railroad telephone that had the word "niggers" written on it.  Scott reported the graffiti to a foreman who then painted over the graffiti.  Finally, Scott claims that Reno made a racial reference when he said "eenie meenie minie moe" while randomly picking five employees to work overtime.  Scott testified that he assumed that Reno intended to complete the statement with "catch a nigger by the toe" not "catch a tiger by the toe." (Scott Dep. at 162.)  Reno did not finish the statement, but Scott claims that Reno nevertheless apologized to Scott.  Additionally, Scott also alleges that other employees called him "boy."

Defendants assert that they are entitled to summary judgment as a matter of law on all of Scott's claims.  Scott, on the other hand, contends that genuine issues of material fact remain on his claims.

## Discussion

### I.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view the evidence and the inferences, which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enterprise Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### II.    Statute of Limitations

As a preliminary matter, Defendants asserts that Scott cannot base his claims on alleged disparate disciplinary treatment, discriminatory lay-offs, and the discrete incidents described by Scott

and Ojard because these claims are barred by the applicable statutes of limitations.[5]  Defendants cites

*Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369 (2004), which states that Section 1981 applies a

four-year statute of limitations to claims of racial discrimination.  Because Scott served this lawsuit on

October 15, 2004, Defendants assert that any claims of disparate treatment that occurred before

October 15, 2000, the date Scott filed his Complaint, are time-barred under Section 1981.  Moreover,

Defendants asserts that the same claims are time-barred under Title VII and the MHRA, which impose

shorter limitation periods upon claims alleging employment discrimination based upon race.  Scott does

not rebut or acknowledge Defendants' assertion that certain alleged acts are time-barred.

The Court agrees with Defendants that certain acts supporting Scott's claims fall outside the

applicable statutes of limitations.  *See Jones*, 541 U.S. at 369 (holding that Section 1981 applies a four-

year statute of limitations to claims of racial discrimination); *Nat'l R.R. Passenger Corp. v. Morgan*,

536 U.S. 101, 128 (2002) (holding that Title VII has a 300-day limitations period for filing charges of

discrimination); and *Turner v. IDS Fin. Servs., Inc.*, 471 N.W.2d 105, 108 (Minn. 1991) (holding that

the MHRA provides that a party must bring a civil action or file a charge within one year of an alleged

---

5    Additionally, Defendants assert that Ojard's affidavit is inadmissible because Ojard's affidavit
lacks foundation—Ojard does not have personal knowledge of the statements and because it includes
hearsay—reported out-of-court statements of Engelmeier.  Defendants assert that Ojard's affidavit
includes an alleged hearsay statement about what Engelmeier told him that he would testify to at his
deposition in an effort to show that DMIR somehow "changed" its legitimate business reason for
suspending Scott.  Defendants contend that, aside from being illogical because Engelmeier did not
impose Scott's suspension, Scott fails to explain that Engelmeier's deposition testimony contrasts
sharply with what Ojard claims it would be in his affidavit.  The Court agrees that much of Ojard's
affidavit is inadmissible, but finds that even if Ojard's assertions are admissible, the outcome of this case
is the same.

discriminatory act).

Accordingly, the following alleged acts are barred by the statutes of limitations:  (1) Scott's allegations that he received disparate treatment from Steve Koski and Greg Walgreen in the 1980s and 1990s, respectively; (2) Scott's allegation that Paul Bergmann was never investigated for bending a crane boom about four years ago; (3) Scott's allegation that Denny Gould used the "n" word at him about five or six years ago; (4) Scott's claim that Hatfield heard Moore make a racial epithet regarding Scott during the late spring or early summer of 2000; and (4) Scott's allegation that he "was always the first man laid off" during the 1970s and 1980s.  Additionally, Scott's allegations related to seeing the word "nigger" written on the inside of an engine two years ago at the Minntac location and seeing the word "nigger" written on a railroad telephone three years ago are time-barred under Title VII and the MHRA.

### III.   Race Discrimination

Scott asserts that he was discriminated against on the basis of his race in violation of Title VII, the MHRA, and Section 1981.  In order to establish a prima facie case of discrimination based on race, Scott must demonstrate that (1) he was a member of a protected group; (2) he was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) similarly situated employees who are not members of the protected group were treated differently.  *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000).

If Scott is able to establish a prima facie case, the burden shifts to Defendants to produce a legitimate, non-discriminatory reason for the adverse employment action.  *See id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If DMIR is able to articulate such a reason, the

burden shifts back to Scott to show that the proffered reason is merely a pretext for discrimination.  *See id.*  The elements and analysis of a discrimination claim under each of the statutes is the same.  *Saulsberry v. St. Mary's Univ. of Minnesota*, 318 F.3d 862, 866 (8th Cir. 2003).

Scott asserts that he has made a prima facie case for racially disparate treatment based on the 60-day suspension for his altercation with Engelmeier.[6]  Scott asserts that Engelmeier was a similarly situated employee who received disparate treatment—a 5-day suspension.  Scott asserts that Engelmeier was similarly situated because DMIR cited both Engelmeier and Scott for violating DMIR's regulation against physical altercations.  Scott also asserts that he and Engelmeier ultimately reported to Moore, despite the fact that Scott directly reported to Engelmeier.

For purposes of their motion, Defendants do not contest that Scott is a member of a protected class, that he met his employer's legitimate expectations, or that he suffered an adverse employment action.  However, Defendants assert that Engelmeier was not similarly situated simply because he was involved in a fight.  Defendants assert that because Engelmeier was Scott's foreman, and thus superior, Scott's actions during the altercation were insubordinate.  Defendants also assert that Scott and

---

6       Alternatively, Scott asserts that he has presented direct evidence of race discrimination.  Scott relies on Hatfield's assertion that Moore referred to Scott stating, "Oh, those niggers are all alike; you know the kind."  The Court, however, finds that the alleged statement does not constitute direct evidence of race discrimination.  First, because Moore allegedly made the statement in late spring or early summer of 2000, the evidence is time-barred under the applicable statute of limitations.  Second, even if the statement were admissible, the comment cannot constitute direct evidence of race discrimination because it could not have formed part of Moore's decision to recommend that Scott be suspended for 60 days because the alleged statement was made too long before the disciplinary action occurred.  *See Yates v. Douglas*, 255 F.3d 546, 549 (8th Cir. 2001) (holding that a one- to two-year lapse between a decision-maker's discriminatory comment and an adverse action does not constitute direct evidence of discrimination).

Engelmeier were not similarly situated because they had different disciplinary histories and because the investigation revealed that Scott was more at fault for the altercation than Engelmeier.

The Court finds that Engelmeier, who is not a member of a protected group, was a similarly situated employee who was treated differently from Scott. The standard for determining whether employees are similarly situated at the prima facie stage is a "low threshold," requiring only that the employees "are involved in or accused of the same or similar conduct and are disciplined in different ways." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir. 2005) (quoting *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004)). Here, DMIR cited both Scott and Engelmeier for participating in the altercation, but Scott received a longer suspension than Engelmeier. Thus, Scott has established a prima facie case of discrimination based on race.

At this stage, the burden shifts to Defendants to produce a legitimate, non-discriminatory reason for the adverse employment action. Defendants assert that DMIR determined the length of Scott's suspension based on Scott's disciplinary history, his insubordination toward his foreman, and his violation of work rules. Scott admits that Defendants satisfied their burden for showing a nondiscriminatory explanation for the disparate discipline. Scott, however, contends that Defendants' explanation was a pretext for racial discrimination.

Scott asserts that DMIR's reliance on Scott's disciplinary history was a pretext for racial discrimination because Scott's prior offenses entailed misuse or damage to property, not altercations or disorderly conduct. Scott asserts that DMIR disciplined him more harshly than other workers who committed similar equipment infractions. Scott also contends that his strong prima facie case provides evidence of pretext. Additionally, Scott alleges that, according to Ojard, Engelmeier was involved in

13

prior altercations with other DMIR employees and received no discipline and that Engelmeier was the aggressor in the altercation and intended to misrepresent the incident in Engelmeier's deposition. Finally, Scott asserts that he was the only African-American on the railroad for over 15 years and that DMIR laid off Scott and other employees with less experience each winter for 15 years.

The Court finds that Scott has not demonstrated that Defendants' legitimate reasons for suspending Scott for 60 days were a pretext for race discrimination. Much of the evidence Scott relies upon is time-barred by the applicable statutes of limitations. Furthermore, even if this evidence were not time-barred, it is too vague to constitute relevant evidence of discrimination. For example, Scott claims that white employees were not disciplined as severely based on similar rule infractions, yet Scott provides only conclusory allegations that these employees were involved in similar situations. Furthermore, Scott admits that he has no knowledge of these employees' disciplinary histories.

As previously stated, Ojard's affidavit includes vague assertions that are not based upon personal knowledge. Therefore, these conclusions are inadmissible. However, even if the vague assertions are admissible, they carry little, if any evidentiary weight, for the reasons stated. Moreover, Ojard testifies about incidents involving Engelmeier that occurred after Scott retired, and therefore are not relevant to Scott's claims. Additionally, Scott's assertion that DMIR's reliance on his prior disciplinary record was a pretext for racial discrimination is unavailing. Regardless of the nature of Scott's prior disciplinary infractions, it is undisputed that Scott had the longest disciplinary history of any DMIR employee during Moore's tenure as Chief Engineer. Accordingly, Scott cannot prove that Defendants' legitimate reasons for Scott's suspension were pretextual. Defendants are entitled to summary judgment as a matter of law on Scott's claim of race discrimination.

14

**IV.     Hostile Work Environment**

To succeed on a hostile work environment claim, Scott must prove four elements:

(1) membership in a protected group; (2) the occurrence of unwelcome harassment; (3) that such

harassment was based on race; and (4) that the harassment affected a term, condition, or privilege of

employment.  *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 652 (8th Cir. 2003).  To alter

the terms and conditions of one's employment, conduct must be severe and pervasive, both objectively

and subjectively.  *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–23 (1993).  When determining

the severity and pervasiveness of an employer's conduct, several factors should be considered,

including:  the frequency of the discriminatory conduct; its severity; whether the conduct is physically

threatening or humiliating or merely offensive; and whether the conduct unreasonably interferes with an

employee's work performance.  *Id.*

Scott alleges that a genuine issue of material fact remains on his claim for racially hostile work

environment.  Scott acknowledges that the racially derogatory graffiti found on workplace surfaces,

Reno's use of the "eenie meenie minie moe" limerick, and co-workers' reference to Scott as "boy," do

not sustain a claim for hostile work environment.  Scott admits that DMIR successfully responded to the

graffiti and that Reno apologized for his statement.  Scott, however, claims that other evidence creates a

genuine issue of material fact regarding his hostile work environment claim.

Scott claims that DMIR failed to address the use of racial epithets effectively, except in the

instances described by Scott.  In support of this claim, Scott points to Ojard's statement that on

numerous occasions, Ojard heard other DMIR employees used the word "nigger" to refer to Scott.

(*See* Ojard Aff. ¶¶ 52–55.)  Scott also claims that Moore's decision to suspend Scott for 60 days in

15

connection with the altercation was racially motivated, as evidenced by Moore's previous use of a racial epithet to refer to Scott.  Scott also claims that DMIR condoned Engelmeier's "hot-tempered" conduct. (Pl's Opp. Mem. at 40.)  Finally, Scott claims that Engelmeier's infliction of a "racially motivated shoulder injury upon [Scott]" by pushing Scott during the altercation creates a genuine issue of material fact regarding Scott's hostile work environment claim.

Defendants assert that most of the alleged racial incidents that Scott points to are time-barred. Regardless, Defendants contend that Scott cannot make a prima facie case of a racially hostile work environment in the face of DMIR's prompt and effective action to Scott's complaints.  Defendants contend that Scott admits that whenever he made a complaint about racial harassment or inappropriate conduct and language, DMIR promptly responded to the complaint.  Defendants maintain that Scott knew that DMIR's Equal Employment Opportunity policy and harassment policy prohibit racial discrimination in the workplace and that Scott observed the EEO policy posted at DMIR facilities. (Scott Dep. at 31.)  Defendants further assert that Scott never complained about Engelmeier's conduct or that his suspension was discriminatory.  Defendants also contend that there is no evidence that anyone reported the alleged incidents and comments described in Ojard's affidavit to DMIR. Moreover, Defendants assert that Scott never heard these alleged remarks.  Defendants assert that, as a matter of law, such infrequent conduct is insufficient to create a hostile work environment.

The Court finds that Scott cannot make a prima facie showing of a racially hostile work environment on this record.  Even assuming that the evidence Scott points to is admissible, and that Scott meets the first three factors of a prima facie case, Scott cannot show that the harassment affected a term, condition, or privilege of employment.  Scott acknowledges that every time he objected to a

racial epithet or graffiti, DMIR promptly responded to the complaint. Scott asserts a hostile work environment based on DMIR employees' alleged use of racial epithets that Scott never heard during his employment. Scott also admits that he did not have contact with Engelmeier after returning from his suspension. Thus, "the alleged harassment was not so severe or pervasive as to alter a term, condition, or privilege of [Scott's] employment. *See Duncan v. General Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002). Accordingly, Defendants are entitled to summary judgment on Scott's hostile work environment claim.

## V.        Constructive Discharge

"A constructive discharge occurs when an employer, through action or inaction, renders an employee's working conditions so intolerable that the employee essentially is forced to terminate [his] employment." *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 617 (8th Cir. 2000). An employee must provide the employer a reasonable opportunity to resolve the "unreasonable working condition[s]" before terminating his employment. *Id.* at 617. If a reasonable opportunity is granted and no remedial action is taken, or the employee reasonably believes that there is no chance of fair treatment, then the employee has been constructively discharged. *Id.* An employee's dissatisfaction with working conditions does not establish a constructive discharge. *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 496 (8th Cir. 1996).

Scott asserts that DMIR's imposition of a 60-day suspension, in contrast with Engelmeier's 5-day suspension, created an intolerable work environment. Scott explains that he felt that DMIR "treat[ed] [Engelmeier] a little better than they treat[ed] me." (Scott Dep. 154.) Therefore, Scott claims he chose early retirement "to avoid the vengeful Engelmeier and an unfair, race-based

termination." (Pl's Opp. Mem. at 43.)  Scott asserts that Ojard's allegation that Engelmeier "had it in for [Scott]" proves that Scott was not being treated fairly.  Further, Scott claims that Hatfield's assertion that Moore had previously referred to Scott using a racial epithet validated Scott's belief that he was being treated unfairly.

Defendants, on the other hand, assert that Scott cannot prove a constructive discharge claim because when Scott returned to work following his suspension, Scott had no further issues with Engelmeier or any other DMIR employee.  Defendants contend that Scott's unsupported and speculative belief that a potential altercation with Engelmeier would occur in the future is an insufficient basis for a constructive discharge claim.  Finally, Defendants contend that DMIR never had the opportunity to correct Scott's perceived issues because Scott never told DMIR that he felt he was being harassed or threatened.

Looking at the evidence in the light most favorable to Scott, the Court finds that there is no indication that Defendants rendered Scott's working conditions so intolerable that Scott was forced to quit.  Scott admits that he had no further contact with Engelmeier once he returned from his suspension.  In addition, Scott never told DMIR that he felt he was being harassed or threatened. Thus, Defendants did not have the opportunity to address Scott's perceived issues.  Based on these facts, Defendants are entitled to summary judgment on Scott's constructive discharge claim.

The Court is deeply offended by anyone's use of racist and provocative terms such as "nigger(s)" and "boy."  The use of such offensive language has wreaked immeasurable havoc and destruction on our society, whether used in the workplace or elsewhere.  Although the Court is offended by the use of such terms and the attitudes that precipitate the use of such terms, the Court finds

18

that Scott does not have actionable claims for race discrimination, hostile work environment, or constructive discharge for the reasons stated.

## VI.   Assault

DMIR asserts that Scott cannot prove that DMIR is liable for assault under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 1-51, *et seq.*  DMIR relies on *Sheaf v. Minneapolis, St. P. & S.S.M.R. Co.*, 162 F.2d 110, 113 (8th Cir. 1947), in which the Eighth Circuit held that an employer cannot be liable for an employee's assault on a co-worker under FELA unless the employee was acting within the scope of his duties.  In his opposition memorandum, Scott states that his "[assault] analysis applies to the F.E.L.A. claim which appears [in his] complaint.[7]  (Pl's Opp. Mem. at 44.)  In his Complaint, Scott states that he "brings this action for damages in personal injury under [FELA]."  (Complaint at 1.)  Yet Scott makes arguments in his opposition memorandum that address an assault claim under Minnesota common law.  Further, Scott's fourth claim alleges "assault under the common law of the State of Minnesota."  (Complaint at ¶ 4.)  Scott's other three claims, for racial discrimination under Title VII, Section 1981, and MHRA, could not have been brought under FELA.  Thus, it is unclear to the Court whether Scott alleges a claim for assault under Minnesota common law or whether Scott alleges a claim of assault under FELA.  The Court, however, finds that Scott cannot prove that Defendants are liable for assault under either theory.

The Court finds that, pursuant to *Sheaf* and its progeny, Scott cannot prove that Defendants are

---

7       Without comment Scott has interchanged the word "battery" for "assault" in his opposition memorandum.  Thus, it appears that Scott wishes to assert a claim for battery.   Because Scott,

(Footnote Continued on Next Page)

liable for assault under FELA.  In *Sheaf*, a railroad conductor brought an action for personal injuries he

sustained as a result of an attack by a co-worker.  *Id.* at 111.  The district court granted the defendant

railroad's motion to dismiss the complaint on the ground that the complaint failed to state a claim upon

which relief could be granted.  *Id.* at 112.  The Eighth Circuit affirmed, stating that negligence must be

the cause of the injury under FELA and finding that:

> Where, as in this case, an employee of a railroad company is injured by an unprovoked
> assault of a fellow servant, even though such an assault may be considered negligence . .
> . the employer is not liable unless the aggressor was at the time of the assault acting
> within the scope of his employment.

*Id.* at 113.  The court found that the facts pleaded did not indicate that the defendant railroad approved

of the employee's assault because the employee did not assume to be acting for or on behalf of the

railroad and the railroad was not charged with having received any benefit from the assault.  *Id.* at 115.

Here, viewing the facts in the light most favorable to Scott, Scott cannot show that Engelmeier

acted within the scope of his employment or to further the business of the company.  Similar to the

assault in *Sheaf*, Engelmeier acted in violation of DMIR's operating rules.  Indeed, DMIR suspended

Engelmeier for his violation of Rule 1.7, which prohibits altercations between employees.  Accordingly,

Defendants are entitled to summary judgment on Scott's assault claim.  *See also Francisco v.

Burlington Northern R.R. Co.*, 204 F.3d 787, 789 (8th Cir. 2000) (applying *Sheaf* and affirming

summary judgment in favor of railroad employer in a FELA assault case where the supervisor acted

outside the scope of his employment); *Lager v. Chicago Northwestern Transp. Co.*, 122 F.3d 523,

---

(Footnote Continued From Previous Page)
however, asserted a claim for assault and not battery in his Complaint, the Court addresses Scott's
(Footnote Continued on Next Page)

525 (8th Cir. 1997) (affirming summary judgment in favor of railroad employer in FELA assault case where there was no competent evidence that the railroad employer knew of co-employee's alleged violent tendencies).

Additionally, Defendants are entitled to summary judgment on Scott's claim for common law assault.[8]  To prove that an employer is liable for common law assault, a plaintiff must show that the employer should have been able to foresee the assault.  *Marston v. Minneapolis Clinic of Psychiatry and Neurology, Ltd.*, 329 N.W.2d 306, 311 n.3 (Minn. 1982); *Grozdanich v. Leisure Hills Health Ctr., Inc.*, 25 F. Supp. 2d 953, 979–80 (D. Minn. 1998).  Here, there is no evidence that Defendants could have foreseen Engelmeier's alleged assault.  It is undisputed that Defendants' operating rules prohibited altercations at work and that Engelmeier had only one prior disciplinary infraction for property damage.  Even if Ojard's statements about Engelmeier were admissible, these statements fail to show that Defendants were aware of Engelmeier's alleged actions and reputation for fighting.  Accordingly, Scott's claim for common law assault fails as a matter of law.

## Conclusion

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.      Defendant's Motion for Summary Judgment (Doc. No. 32) is **GRANTED**.

---

(Footnote Continued From Previous Page)
claim as one for assault.

8      Defendants allege that Scott cannot assert a claim for common law assault because FELA is the exclusive law under which a railroad employee may make an assault claim.  The Court does not address this assertion because even if Scott were permitted to bring a claim for common law assault, the claim would fail on the merits.

2.      Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.

3.      Plaintiff's Motion to Strike Defendants' Supplemental Reply Affidavit, or in the

Alternative, to Strike Exhibit E of the Defendants' Reply Affidavit (Doc. No. 51) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  February 17, 2006          s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   Judge of United States District Court

22